**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **RAFAEL DELACRUZ, JR.** | : | **CIVIL NO. 1:10-CV- 139** |
| | : | |
| **Petitioner,** | : | **(Judge Caldwell)** |
| **v.** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **WARDEN B.A. BLEDSOE** | : | |
| | : | |
| **Respondent.** | : | |

## REPORT AND RECOMMENDATION

### I.    Introduction

In this habeas corpus petition we are called upon to answer two questions regarding the application of the Second Chance Act, a 2008 federal statute designed to provide prison officials with greater discretion in assisting inmates in making the transition back into society by permitting prison officials to place inmates in Residential Re-entry Centers up to 12 months before they are released from custody.

First, we must determine whether a federal inmate who wishes to bring a habeas corpus petition based upon an alleged failure by prison staff to comply with the Act must first exhaust administrative remedies within the prison system. For the reasons set forth below, we conclude that exhaustion of these administrative remedies is a prerequisite to federal habeas corpus relief in this setting. We also find that Delacruz

has effectively exhausted his administrative remedies by appealing this decision denying him early placement in a Residential Re-entry Center through the Bureau of Prisons grievance system, and that the Bureau of Prisons may not preclude consideration of his claims on their merits simply by asserting that he failed to attach "the correct number of carbonized copies" to his administrative appeal. (Doc.6, p.4.)

Second, this petition invites us to determine whether, and to what extent, the Second Chance Act gives federal inmates a substantive right to early release to a halfway house or other non-custodial setting as they near the conclusion of their prison terms. With respect to this question, we find, consistent with the vast majority of courts, that the Act does not create a specifically enforceable right to release at any particular time. Rather, it provides guidance to prison officials in the exercise of their longstanding statutory discretion concerning inmate placements, guidance that permits, but does not compel, earlier release to a residential setting for inmates. Accordingly, what the law requires is for prison staff to give each inmate individualized consideration for earlier residential release, but leaves that individualized assessment largely in the discretion of corrections staff. Thus, we find that the requirements of the Act are fully met where, as in this case, the evidence shows that the Petitioner received a carefully tailored and individualized assessment of his suitability of placement in a Residential Re-entry Center.

## II.    Statement of Facts and of the Case

### A.    Rafael Delacruz

Rafael Delacruz is a 31 year-old federal inmate who is currently serving a 57 month prison term at the Lewisburg federal prison complex, following his conviction for distribution of more than 5 grams of cocaine base. (Doc. 6, Ex. 1, attach.3-5.) Delacruz  has been incarcerated at Lewisburg since  January 14, 2009. ( Id. ¶ 4.) Assuming that he earns all of his good conduct time credit, Delacruz has a projected release date of January 17, 2011.(Id. ¶ 5.)

Delacruz has prior convictions for drug offenses and crimes of violence, and is described as an inmate with an "extensive" prior record. (Id., Ex. 1, ¶ 13.) Delacruz also has a documented history of prior drug abuse, (Id. Ex. 1, attach.3-5), although he has successfully undergone a 500 hour residential drug abuse program while in custody. (Id. Ex. 1, attach.3.) While incarcerated at Lewisburg, Delacruz has maintained clear institutional conduct without any significant infractions. (Id., Ex. 1, ¶ 13.)

### B.    The Second Chance Act and BOP Implementing Guidance

While Delacruz was serving this federal  sentence, in April of 2008, the Second Chance Act of 2007, Pub. L. No. 110-199, went into effect. This act contains several provisions which are designed to aid prisoners in their transition back into society. For

example, the Act authorizes the Bureau of Prisons to place certain inmates in Residential Re-entry Centers (RRC) for as much as one year at the end of their prison terms to aid them in their readjustment into society. See 18 U.S.C. § 3624(c)(1).[1] While Delacruz has been in federal custody the Bureau of Prisons has adopted a series of policies, practices and procedures which govern inmate placement and custody.

---

[1]18 U.S.C. § 3624(c) provides as follows:

**( c ) Prerelease custody.–**

**(1) In general.**--The Director of the Bureau of Prisons shall, to the extent practicable, ensure that a prisoner serving a term of imprisonment spends a portion of the final months of that term (not to exceed 12 months), under conditions that will afford that prisoner a reasonable opportunity to adjust to and prepare for the reentry of that prisoner into the community. Such conditions may include a community correctional facility.

**(2) Home confinement authority.**--The authority under this subsection may be used to place a prisoner in home confinement for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months.

**(3) Assistance.**--The United States Probation System shall, to the extent practicable, offer assistance to a prisoner during prerelease custody under this subsection.

**(4) No limitations.**--Nothing in this subsection shall be construed to limit or restrict the authority of the Director of the Bureau of Prisons under section 3621

18 U.S.C. § 3624 (c).

(Doc. 6, Ex.1, attach. 1-6.)  These policies, in part, speak to the issue of Residential Re-entry Centers (RRC) placements of inmates in the year prior to their release dates.

These prison policies, which are attached to the response to this petition, specifically directed that as a result of the Second Chance Act: (1) RRC placements were increased to a maximum of twelve months; (2) RRC placement determinations are to be made on an individualized basis using the criteria set forth at 18 U.S.C. §3621(b); and, (3) sentencing court orders, recommendations or requests directing an inmate's placement in an RRC were not binding on the Bureau of Prisons.

The Bureau of Prisons policies governing implementation of the Act further specifically instructed prison staff that all "inmates must now be reviewed for pre-release RRC placements 17-19 months before their projected release dates," and the memorandum sets forth the five factors under 18 U.S.C. § 3621(b) which must be considered when determining RRC placement dates. (Id.) With respect to the latter advisement, the memorandum stated, "the Act requires staff to ensure that each pre-release RRC placement decision is 'of sufficient duration to provide the greatest likelihood of successful reintegration into the community.'" (Id. Ex. 1, Attach. 1 )

Thus, staff were admonished that they "must approach every individual inmate's assessment with the understanding that he/she is now eligible for a maximum of 12 months pre-release RRC placement." (Id., emphasis in original.) The guidance

provided to prison staff further states as follows: "While the Act makes inmates eligible for a maximum of 12 months pre-release RRC placements, Bureau experience reflects inmates' pre-release RRC needs can usually be accommodated by a placement of six months or less. Should staff determine an inmate's pre-release RRC placement may require greater than six months, the Warden must obtain the Regional Director's written concurrence before submitting the placement to the Community Corrections Manager." (Id.) Therefore, the Bureau of Prisons policy guidance implementing the Act accomplishes three goals: First, it mandates consideration of 12 month residential re-entry center programs for all inmates. Second, while mandating this individualized consideration, the policy notes that for many prisoners "inmates' pre-release RRC needs can usually be accommodated by a placement of six months or less." Therefore, the policy contains a third critical component requiring Regional Director approval for RRC placements exceeding 6 months.

## C. Application of The Second Chance Act and Implementing Guidance to Delacruz's RRC Placement

It is against this statutory regulatory and administrative background that prison officials considered an RRC placement for Rafael Delacruz. That consideration began in the summer of 2009. On July 17, 2009, an RRC consideration form for Delacruz was completed and approved by his prison unit manager. (Id., Ex. 1, Attach. 3.) At that

time Delacruz was recommended for 180 days RRC placement. (<u>Id.</u>) On July 23, 2009, a Program Review was held for Delacruz. (<u>Id.</u> Ex. 1,¶ 11, Attach. 4.) This review was reflected in an inmate skills development plan, (<u>Id.</u>, Attach. 4 to Ex. 1), which thoroughly and individually documented Delacruz's criminal history, institutional conduct, social development, training programs, social history and family background. (<u>Id.</u>) During this review, Delacruz was informed that a range of 150-180 days would be recommended for RRC placement. (<u>Id.</u>) This recommendation was discussed with Delacruz and it was determined that this range was of sufficient duration to provide the greatest likelihood of successful reintegration into the community.(<u>Id.</u>)

On December 28, 2009, the Acting Unit Manager, the Case Manager Coordinator ("CMC"), the Inmate Systems Manager ("ISM") and the Warden approved DeLacruz's recommended RRC placement for 120-180 days.( <u>Id.</u> Ex. 1 ¶ 12, Attach. 5.). This recommendation was based on DeLacruz's past offenses and current behavior, noting that Delacruz has an extensive criminal history, but had maintained clear conduct and completed a 500 hour drug program while incarcerated at USP Lewisburg Camp. This recommendation also considered the available RRC resources within the release district. Delacruz currently has an RRC placement date of July 22, 2010, at the Hampshire House in Manchester, New Hampshire.

### D. Bureau of Prisons Grievance Procedures and Delacruz's Administrative Efforts To Challenge This RRC Placement Decision

With respect to inmate concerns regarding RRC placements and other matters, the Bureau of Prisons has adopted a three-tiered administrative remedy procedure with respect to inmate complaints which is set forth at 28 C.F.R. § 542.10, et seq. As part of this grievance process, inmates should first present their complaints to staff, and staff are obliged to attempt to informally resolve any issues before an inmate files a formal request for Administrative Remedy. Id. at § 542.13(a). At the second stage of this process, if an inmate is unable to informally resolve his complaint, the inmate may file a formal written complaint to the Warden, on the appropriate form within twenty (20) calendar days of the date on which the events which form the basis for the complaint took place. Id. at § 542.14(a). If the inmate's concern is not addressed to the inmate's satisfaction by the Warden's response, the inmate may then file an appeal to the Regional Director within twenty (20) calendar days. Id. at § 542.15(a). Finally, if the inmate is dissatisfied with the Regional Director's response, that decision may then be appealed to the General Counsel (Central Office) within thirty (30) calendar days from the date of the Regional Director's response. Id. The Regional Director then has thirty (30) calendar days to respond and the General Counsel has forty (40) calendar days to address the inmate's concern. Id. at § 542.18.

As these regulations state: "The purpose of the Administrative Remedy Program is to allow an inmate to seek formal review of an issue relating to any aspect of his/her own imprisonment." 28 C.F.R. § 542.10(a). Under this grievance process: "If an inmate raises an issue in a request or appeal that cannot be resolved through the Administrative Remedy Program, the Bureau will refer the inmate to the appropriate statutorily-mandated procedures." Id. at § 542.10(c). Furthermore, under these procedures, no administrative remedy appeal is considered to have been fully exhausted until decided by the Central Office. 28 C.F.R. § 542, et seq.

Notified of this proposed RRC placement by prison officials in July of 2009, Delacruz followed a halting and uneven, but ultimately complete, course in challenging this prison placement decision through the institutional grievance system. First, Delacruz took no action in this matter for six weeks, from July until early September 2009. On September 1, 2009, Delacruz filed Administrative Remedy at the institution level. (Doc. 6,. Ex. 2. ¶ 5, Attach. 1. ). This initial grievance was denied on September 10, 2009. (Id.) Delacruz then filed his appeal with the Northeast Regional Office on September 24, 2009, which was also denied in a decision rendered on October 23, 2009. (Id., ¶ 7, Attach. 1.)

Following this denial of his grievance, Delacruz then made two attempts to appeal this matter to the Bureau of Prisons Central Office, both of which were

rejected, not on their merits, but because the Bureau of Prisons concluded that Delacruz had not followed clerical filing instructions. (Id., ¶¶ 8-9, Attach. 1. at 67.) Delacruz's first attempted appeal was filed on at the Central Office on November 17, 2009, and was rejected on January 6, 2010, for failing "to submit the correct number of copies." (Id.) Although Delacruz resubmitted his appeal to the Central Office on January 12, 2010, it was rejected on February 3, 2010 because he failed to provide necessary attachments. (Id.) Specifically Delacruz's second Central Office appeal was denied because he allegedly "failed to attach the BP-9, BP-10, and the correct number of carbonized copies." (Id.) Delacruz was informed that he could re-submit his appeal within 15 days of the rejection notice, but did not elect to do so.(Id.) By adopting this approach to Delacruz's appeal, which emphasized clerical requirements, the Bureau of Prisons never addressed the merits of his complaints regarding his RRC placement.

### E.    Delacruz's Habeas Petition

On January 20, 2010 Delacruz filed this petition for writ of habeas corpus. (Doc. 1.) In his petition Delacruz challenges the prison's decision to deny him 12 month early release consideration under the Second Chance Act, arguing that the actions of prison personnel are inconsistent with the law, and constitute part of a pattern of categorical refusals to consider such placements. These issues have been fully briefed by the parties (Docs. 1 and 6) and are now ripe for disposition. For the reasons set

forth below, it is recommended that the Court find that Delacruz has exhausted his administrative remedies, but deny this petition because the petition fails on its merits.

### III. <u>Discussion</u>

#### A. <u>The Exhaustion Doctrine Does Not Bar Consideration of This Habeas Petition.</u>

At the outset in this case, Respondents invite us to treat Delacruz's petition in the same way that the Bureau of Prisons treated his administrative appeal; that is, deny the petition on procedural grounds without ever speaking to the merits of his request. Specifically, the Respondents invite us to deny this petition based upon Delacruz's failure to exhaust his administrative remedies. Respondents advance this argument, even though they concede that Delacruz followed the full administrative appeal procedure prescribed by the Bureau of Prisons. Moreover, Respondents urge us to take this position even though Delacruz's administrative grievance was rebuffed, not on its merits, but because he allegedly failed to file "the correct number of carbonized copies" when he submitted his appeal.

We will decline this invitation. Although 28 U.S.C. § 2241 contains no express exhaustion requirement, "[o]rdinarily, federal prisoners are required to exhaust their administrative remedies prior to seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2241." <u>Gambino v. Morris</u>, 134 F.3d 156, 171 (3d Cir.1998); <u>see</u> <u>also</u>, <u>e.g.</u>,

Callwood v. Enos, 230 F.3d 627, 634 (3d Cir.2000); Bradshaw v. Carlson, 682 F.2d 1050, 1052 (3d Cir.1981). These exhaustion rules serve an important and salutary purpose. The United States Court of Appeals for the Third Circuit requires administrative exhaustion of a claim raised under § 2241 for three reasons: "(1) allowing the appropriate agency to develop a factual record and apply its expertise facilitates judicial review; (2) permitting agencies to grant the relief requested conserves judicial resources; and, (3) providing agencies the opportunity to correct their own errors fosters administrative autonomy." Moscato v. Federal Bureau of Prisons, 98 F.3d 757, 761-62 (3d Cir.1996); see also Gambino, 134 F.3d at 171; Lyons v. U.S. Marshals, 840 F.2d 202, 205 (3d Cir.1988).

In this case, it is undisputed that Delacruz has pursued administrative appeals throughout the Bureau of Prisons system, seeking re-consideration of this placement decision from the warden, the regional director, and the Bureau of Prisons Central Office. Those grievances have been uniformly denied, with the Central Office electing to rest its decision to deny Delacruz relief solely upon his alleged failure to make adequate copies off his appeal. With respect to habeas petitions which challenge the denial of RRC placements under the Second Chance Act: "Courts in the Middle District of Pennsylvania have consistently held that 'exhaustion of administrative remedies is not rendered futile simply because a prisoner anticipates he will be

unsuccessful in his administrative appeals before the twelve-month pre-release mark, which is simply a statutory maximum and not a mandate.' " Ross v. Martinez, No. 09-1770, 2009 WL 4573686, 3 (M.D.Pa. Dec. 1, 2009)(citations omitted). Rigorously applying these exhaustion requirements, this court has in the past consistently rejected habeas petitions brought under the Second Chance Act where inmates have failed to fully exhaust their administrative remedies. See, e.g., Lacy-Thompson v. Martinez, No. 09-1320, 2009 WL 4823875 (M.D. Pa. Dec. 14, 2009); Ferris v. Holt, No. 09-1465, 2009 WL 3260557 (M.D. Pa. Oct. 8, 2009); Drummond v. Martinez, No. 09-1258, 2009 WL 3241851 (M.D. Pa. Oct. 5, 2009).

While we agree that administrative exhaustion is a prerequisite to seeking habeas relief challenging some aspect of prison discretion in a Residential Re-entry Center placement under the Second Chance Act, these cases which have denied habeas relief to a prisoner on exhaustion grounds have consistently involved instances in which the inmate has failed to complete the three-step grievance process prescribed by the Bureau of Prison. Id. In contrast, in this case Delacruz completed that process, appealing both to the regional director and to the Bureau of Prisons Central Office. The Central Office, however, elected to reject his appeal, twice, on procedural grounds because he had not submitted adequate copies of his appeal paperwork. Thus, the

Bureau of Prisons rejected these grievances on these grounds without ever reaching the merits of his concerns.

In such a situation, where the inmate has acted in good faith and has completed all steps of the grievance process, we believe that the agency's decision to deny his appeal on procedural grounds should not serve as a bar to the inmate's access to federal court. Given Delacruz's efforts to present this issue, the Bureau of Prison could easily have responded to the merits of his request, while also addressing these procedural aspects of his appeal. Had the Bureau of Prisons accepted any of Delacruz's invitations to consider the merits of his claims, the goals of exhaustion would have been fully met here. In such an instance, the agency's consideration of this appeal on its merits would have: "(1) allow[ed] the . . . agency to develop a factual record and apply its expertise facilitates judicial review; (2) permitt[ed] [the] agenc[y] to grant the relief requested conserves judicial resources; and, (3) provid[ed] [the] agenc[y] the opportunity to correct their own errors fosters administrative autonomy." Moscato v. Federal Bureau of Prisons, 98 F.3d 757, 761-62 (3d Cir.1996). Instead, by choosing to deny the request based upon Delacruz's purported failure to submit "the correct number of carbonized copies," the Bureau of Prisons forfeited the opportunity to use this process to secure all of the benefits of administrative exhaustion. Having decided to forego the benefits of exhaustion in terms of allowing the agency to

consider the merits of an inmate request, it would be anomalous to allow the agency to now assert the exhaustion doctrine as a bar to merits consideration of this petition in federal court when it is clear that Delacruz attempted to fully exhaust his remedies.

Moreover, adopting an exhaustion requirement which ties access to federal court to an inmate's failure to submit "the correct number of carbonized copies" in an administrative appeal conflicts with the standards which govern the exhaustion doctrine generally in habeas petitions. That doctrine recognizes that, while this exhaustion rule compels petitioners to permit another court or agency a fair "opportunity to apply controlling legal principles to the facts bearing upon [the petitioner's] constitutional claim," Picard v. Connor, 404 U.S. 270, 276 (1971), this requirement should be applied in a commonsense fashion. Thus, as a general rule, the exhaustion requirement is met when a petitioner submits the gist of his federal complaint to a court or agency for consideration, without the necessity that the petitioner engage in some "talismanic" recitation of specific constitutional claims. Evans, 959 F.2d at 1230-33. Similarly, a petitioner meets his obligations by fairly presenting a claim, even if the court or agency declines to specifically address that claim. See Dye v. Hofbauer, 546 U.S. 1(2005) (per curiam); Johnson v. Pinchak, 392 F.3d 551, 556 (3d Cir. 2004).

Adopting this practical and commonsense view of the exhaustion requirement we find that Delacruz has exhausted his remedies by pursuing appeals to the warden, the regional director and the Central Office. We decline the invitation of the Bureau of Prisons to condition Delacruz's access to the courts upon his submission of "the correct number of carbonized copies" in an administrative appeal to the Central Office. Instead, we find that Delacruz has exhausted his administrative remedies by completing all three steps of the Bureau of Prisons administrative appeal process even if the merits of his claim were not considered by that agency in its final agency decision. See Wires v. Bledsoe, No. 09-2247, 2010 427769, *3, n.1 (M.D.Pa. Feb. 3, 2010); Strong v. Schultz, 599 F.Supp.2d 556, 561 (D.N.J. 2009).

## B.     This Petition Fails on Its Merits

While we find that Delacruz has exhausted his administrative remedies, given the standard of review which we believe should apply to these matters, we conclude that Delacruz has not carried his burden of establishing that this discretionary decision by the Bureau of Prisons violated any rights guaranteed to him by the Constitution or laws of the United States. Therefore, we recommend that this petition be denied on its merits.

At the outset, it is clear that Delacruz's petition does not raise any concerns of a Constitutional dimension. Nor can Delacruz rely upon Constitutional concerns to

challenge this RRC placement decision since it is well established that the United States Constitution does not confer any right upon an inmate to any particular custody or security classification. Moody v. Daggett, 429 U.S. 78, 88 (1976); Montanye v. Haymes, 427 U.S. 236, 242 (1976). Thus, inmates do not have a liberty interest in retaining or receiving any particular security or custody status "[a]s long as the [challenged] conditions or degree of confinement is within the sentence imposed ... and is not otherwise violative of the Constitution." Id.

Similarly, it has long been recognized that the mere fact of a prison transfer, standing alone, does not constitute cruel and unusual punishment in violation of the Eighth Amendment to the Constitution. See, e.g., Hassain v. Johnson, 790 F.2d 1420 (9th Cir. 1986); Serrano v. Torres, 764 F.2d 47 (1st Cir. 1985). Thus, even inmate transfers to facilities far from their homes do not rise to the level of cruel and unusual punishment. See, e.g., Gov't of Virgin Island v. Gereau, 592 F.2d 192 (3d Cir. 1979)(transfer from Virgin Islands to mainland); Rodriguez-Sandoval v. United States, 409 F.2d 529 (1st Cir. 1969)(transfer from Puerto Rico to Atlanta). In short, well-settled law establishes that prisoners have no inherent constitutional right to placement in any particular prison, such as a Residential Re-entry Center, to any security classification, or to any particular housing assignment. See Olim v. Wakinekona, 461 U.S. 238, 245 (1983); Meachum v. Fano, 427 U.S. 215 225 (1976); Montanye, 427

U.S. at 242; <u>Bulger v. U.S. Bureau of Prisons</u>, 65 F.3d 48 (5thCir. 1995); <u>Marchesani v. McCune</u>, 531 F.2d 459 (10th Cir.1976).

Rather, Delacruz's sole avenue for substantive relief lies through the Second Chance Act itself. Withe respect to habeas claims premised on the Act, as we have noted, in April of 2008, the Second Chance Act of 2007, Pub. L. No. 110-199, went into effect. This act contains several provisions which are designed to aid prisoners in their transition back into society. For example, the Act authorizes the Bureau of Prisons to place certain inmates in Residential Re-entry Centers for up to one year at the end of their prison terms to aid their readjustment into society. <u>See</u> 18 U.S.C. § 3624(c)(1).[2]

─────────────────────

[2]18 U.S.C. § 3624(c) provides as follows:

**( c ) Prerelease custody.**–

**(1) In general.**--The Director of the Bureau of Prisons shall, to the extent practicable, ensure that a prisoner serving a term of imprisonment spends a portion of the final months of that term (not to exceed 12 months), under conditions that will afford that prisoner a reasonable opportunity to adjust to and prepare for the reentry of that prisoner into the community. Such conditions may include a community correctional facility.

**(2) Home confinement authority.**--The authority under this subsection may be used to place a prisoner in home confinement for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months.

**(3) Assistance.**--The United States Probation System shall, to the extent practicable, offer assistance to a prisoner during prerelease custody under this

While the Act, promotes policies assisting inmates in reintegration into society, nothing in the Act is mandatory, and the Act does not compel the Bureau of Prisons to provide particular inmates with a specific community confinement or home detention placement. Quite the contrary, the statutory text makes it clear that prison officials retain their broad discretion in placing, housing, transferring and classifying inmates. Thus, 18 U.S.C. § 3624(c)(4) clearly states that the Act in no way restricts the broad discretion conferred upon the Bureau of Prisons under 18 U.S.C. § 3621 to make decisions on how best to house inmates, providing that: "Nothing in this subsection shall be construed to limit or restrict the authority of the Director of the Bureau of Prisons under section 3621". Section 3621, in turn, broadly reaffirms the discretion of prison officials in this field to make appropriate prison placement decisions based upon five statutory factors set forth in 18 U.S.C. § 3621(b). [3]

---

subsection.

**(4) No limitations.**--Nothing in this subsection shall be construed to limit or restrict the authority of the Director of the Bureau of Prisons under section 3621

18 U.S.C. § 3624(c).

[3]18 U.S.C. § 3621(b) provides:

(b) Place of imprisonment.--The Bureau of Prisons shall designate the place of the prisoner's imprisonment. The Bureau may designate any available

Similarly, while the Second Chance Act amended 42 U.S.C. § 17541 to encourage the Bureau of Prisons to examine early release and social re-integration for certain offenders, the Act expressly reaffirms that decisions relating to which offenders may qualify for the program involve assessments that rest in the sound discretion of the Bureau of Prisons. See 42 U.S.C. §§ 17541(a)(2) and (g)(5).

Indeed, as it relates to inmate community confinement decisions, the Second Chance Act speaks directly to the discretion retained by the Bureau of Prisons in 18 U.S.C. § 3624(c)(1) which provides as follows:

---

penal or correctional facility that meets minimum standards of health and habitability established by the Bureau, whether maintained by the Federal Government or otherwise and whether within or without the judicial district in which the person was convicted, that the Bureau determines to be appropriate and suitable, considering-

(1) the resources of the facility contemplated;
(2) the nature and circumstances of the offense;
(3) the history and characteristics of the prisoner;
(4) any statement by the court that imposed the sentence--
    (A) concerning the purposes for which the sentence to imprisonment was determined to be warranted; or
    (B) recommending a type of penal or correctional facility as appropriate; and,
(5) any pertinent policy statement issued by the Sentencing Commission pursuant to Section 994(a)(2) of Title 28 . . . Any order, recommendation, or request by a sentencing court that a convicted person serve a term of imprisonment in a community corrections facility shall have no binding effect on the authority of the Bureau under this section to determine or change the place of imprisonment of that person.

**( c ) Prerelease custody.**–

**(1) In general.**--The Director of the Bureau of Prisons shall, to the extent practicable, ensure that a prisoner serving a term of imprisonment spends a portion of the final months of that term (not to exceed 12 months), under conditions that will afford that prisoner a reasonable opportunity to adjust to and prepare for the reentry of that prisoner into the community. Such conditions <u>may</u> include a community correctional facility.

18 U.S.C. § 3624(c)(1)(emphasis added).

The use of the word "may" in § 3624 (c), has led courts to consistently hold that the Act creates no absolute, enforceable legal right to a 12- month RRC placement for any prisoner. <u>See, e.g.</u>, <u>O'Hara v. Rios</u>, No. 08-5160, 2009 U.S. Dist. LEXIS 90243 (D. Minn. Sept. 28, 2009); <u>McGee v. Thomas</u>, No. 09-455, 2009 U.S. Dist. LEXIS 62617 (D. Ore. July 22, 2009). Rather, what is required by the Act is a showing that the Bureau of Prisons engaged in an individualized determination of each inmate's RRC placement, using the statutory factors set forth in the law. <u>Smith v. Sanders</u>, No. 09-3083, 2009 U.S. Dist. LEXIS 82265 (C.D. Cal. July 31, 2009).

Moreover, in considering whether the Bureau of Prisons has properly exercised its broad discretion in this field, over the past year courts have frequently examined the Bureau of Prisons policy statements implementing the Act. These policies statements: (1) note that many inmates can be successfully re-integrated into society

in 180 days or less: and, (2) require regional director approval for 12-month RCC placements. Much recent litigation in this field has focused on the issue of whether this policy guidance violates the Second Chance Act by creating unwarranted institutional and bureaucratic obstacles to such 12-month placements. As to this issue, courts are divided.

The majority view, reflected in numerous trial court opinions, and in the only appellate court decision to have considered this issue, holds that the Bureau of Prisons' requirement of regional director approval, and the agency's stated view that many inmates can have their needs meet through 180-day RRC placements, do not violate the Act. See,e.g., Miller v. Whitehead, 527 F.3d 752,755-58 (8th Cir. 2008); Wires v. Bledsoe, No. 09-2247, 2010 WL 427769 (M.D.Pa. Feb. 3, 2010)(citing Torres v. Martinez, No. 09-CV-1070 (M.D.Pa. Aug.12, 2009)); Fleischi v. Outlaw, No. 09-79, 2009 U.S.Dist. LEXIS 99306 (E.D. Ark. Oct. 26, 2009); O'Hara v. Rios, No. 08-5160, 2009 U.S. Dist. LEXIS 90243 (D. Minn. Sept. 28, 2009); Holland v. Bureau of Prisons, No. 08-3960, 2009 WL 2872835 (D.S.C. Sept. 2, 2009); Smith v. Sanders, No. 09-3083, 2009 U.S. Dist. LEXIS 82265 (C.D. Cal. July 31, 2009); Yanucci v. Stansberry, No. 08-561, 2009 WL 2421546 (E.D.Va. July 28, 2009); McGee v. Thomas, No. 09-455, 2009 U.S. Dist. LEXIS 62617 (D. Ore. July 22, 2009); Sessel v. Outlaw, No. 08-212, 2009 WL 1850331 (E.D. Ark. June 25, 2009); Stanko

v. Rios, No. 08-4991, 2009 WL 1303969 (D. Minn. May 8, 2009); Somerville v. DeWalt, No. 09-68, 2009 U.S.Dist. LEXIS 37454 (E.D. Ky. May 1, 2009); Snyder v. Angelini, No. 07-3073, 2008 U.S. Dist. LEXIS 86460 (E.D.N.Y. Oct. 27, 2008). This view has been adopted by at least one court in this district. Wires v. Bledsoe, No. 09-2247, 2010 WL 427769 (M.D.Pa. Feb. 3, 2010)(citing Torres v. Martinez, No. 09-CV-1070 (M.D.Pa. Aug.12, 2009))(Munley, J.)

Recognizing the broad discretion expressly conferred to the Bureau of Prisons by statute, these cases consistently hold that the requirement of regional director approval for 12-month RRC placements, and the various agency statements expressing an institutional view that RRC placements of 6 months or less are generally adequate for most inmates, do not violate the Act. Rather these policies simply reflect the Bureau of Prisons' exercise of its discretion in implementing the Act, an Act which simply "may" use community corrections facilities for up to 12 months to aid inmates in their return to society. Id. Therefore, these cases find nothing fundamentally offensive about these agency policy preferences, provided that each inmate receives the individualized consideration of this RRC placement called for by the Act. Id.

Two cases take a different view. <u>Krueger v. Martinez</u>, 665 F.Supp.2d. 477 (M.D. Pa. 2009); <u>Strong v. Schultz</u>, 599 F.Supp.2d 556 (D.N.J. 2009).[4] In <u>Strong</u> and <u>Krueger</u>, the district courts found that: (1) the agency requirement of prior regional director approval for 12-month RCC placements; and, (2) the agency's stated position that "inmates' pre-release RRC needs can usually be accommodated by a placement of six months or less", so restrict inmate access to the 12-month RRC programs permitted under the Second Chance Act that they constitute an abuse of discretion by the Bureau of Prisons. <u>Id</u>. In <u>Krueger</u>, the district court also went on to note another shortcoming in the agency's implementation of the Act, observing that in making its particular RRC placement the agency appeared to have failed to consider a statutory requirement under 42 U.S.C. § 17541 that the Bureau of Prisons use early RRC placements to create incentives for inmates to participate in educational programs. <u>Krueger v. Martinez</u>, 665 F.Supp.2d. 477, 484-86 (M.D. Pa. 2009). Citing these concerns, these two courts granted habeas petitions, but only permitted a very limited form of relief, directing the agency to simply reexamine its decision without taking

---

[4]Because these cases were not discussed by Respondents in their pleadings, but have on-going relevance to this issue, they are commended to the attention of the Respondents, so that in the future the Respondents can speak to these cases when engaging in merits analysis of Second Chance Act questions.

into consideration the general agency policy guidance which the courts found to violate the goals of the Act.

While these two cases express this view with great force, it is recommended that the Court adopt the majority view in terms of its framework for analysis of this habeas petition. At the outset, imposing this heightened scrutiny to these prison placement decisions can create a legal and analytical dilemma for reviewing courts in terms of defining the proper scope of judicial review in an area committed to agency discretion. This dilemma is aptly described by the one of the leading decisions in this field, <u>Miller v. Whitehead</u>, <u>supra</u>, which succinctly identified the dangers which may arise if agency determinations regarding how to implement statutes concerning inmate prison assignments which provide for the exercise of substantial discretion are not given due deference. As the Court noted:

> Taken to its logical conclusion, the argument advanced by the inmates would require the BOP to consider daily requests for transfer to an RRC from every inmate in a facility, and to deny such requests only after an individualized consideration of each inmate's request and the five statutory factors. We agree . . . that "Congress surely did not intend such a result." <u>See Muniz v. Sabol</u>, 517 F.3d 29, 36 n. 14 (1st Cir.2008). "Even if a statutory scheme requires individualized determinations, ... the decisionmaker has authority to rely on rulemaking to resolve certain issues of general applicability unless Congress clearly expresses an intent to withhold that authority." <u>Lopez v. Davis</u>, 531 U.S. 230, 243-44,(2001) (internal quotation omitted).

<u>Miller,</u> 527 F.3d at 757.

These dangers may not have been fully addressed by those two cases which have granted habeas relief, since neither court discussed <u>Miller</u>, the leading appellate court decision in this field, in reaching their conclusions.

Furthermore, we agree with the majority of courts which have considered this statutory text, that the Second Chance Act does not appear to have the type of force that <u>Strong</u> and <u>Krueger</u> suggest. While the Act authorizes 12-month RRC placements by the Bureau of Prisons, it does not mandate them. Instead, the Act expressly and repeatedly emphasizes that the Bureau of Prisons retains full discretion in identifying when and how inmates are placed at RRCs. <u>See, e.g.</u>, 18 U.S.C. §§ 3621(b), 2624(c)(1) and (4); 42 U.S.C. §§ 17541(a)(2) and (g)(5).

Moreover, while we recognize the force of institutional inertia, and the fact that these policy prescriptions will restrict the number of inmates who receive this 12-month program, any exercise of discretion yields this result for some inmates, yet Congress expressly authorized the exercise of this discretion by the Bureau of Prisons when implementing this program. <u>See, e.g.</u>, 18 U.S.C. §§ 3621(b), 2624(c)(1) and (4); 42 U.S.C. §§ 17541(a)(2) and (g)(5). Furthermore, the requirement of regional director approval for 12-month placements in RRCs and limiting extended access to these programs is rationally related to one of the statutory factors which govern prison placements; namely, the allocation of limited available prison resources. <u>See</u> 18

U.S.C. 3621(b). Without centralized coordination of these placements, individual institutions applying guidance in different ways could quickly exhaust available inmate housing. Thus, the various competing demands for these placements is a factor which strongly cautions in favor of some centralized assessment of extended RCC placement requests.

Finally, while we agree with the <u>Miller</u> court that individualized assessments of specific RRC placement decisions is not a task well-suited for the courts, we also note that the broader question of the Bureau of Prisons' overall implementation of its discretion under the Second Chance Act is also an issue which is more appropriately considered in some other forum. In that regard, the Act expressly calls for legislative oversight of this process, mandating that the Bureau of Prisons prepare and submit to Congress annual reports documenting the way in which it exercises the discretion conferred upon it by Congress in this field. <u>See</u> 42 U.S.C. § 17541(d). While this Congressional oversight is not a reason to forego our responsibilities here, it is a factor which suggests that in fulfilling our responsibility we should focus on ensuring that each inmate receives the individualized consideration called for by the law, and may leave the broader public policy assessment of how well prison policies meet Congressional expectations to another forum.

In short, adopting a view which calls for a particularized analysis and assessment of the wisdom Bureau of Prisons policy guidance in the area of RRC placements could draw the courts into an individualized assessment of each inmate's case against the five statutory factors, a result Congress could not have intended. Miller, 527 F.3d at 757. Moreover, many of these policies, and particularly the policy requiring centralized review of extended RRC placements, are rationally related to institutional needs that are expressly delegated to the Bureau of Prisons. Further, to the extent that there is a need to engage in an overall assessment of how these policies are being implemented, the Second Chance Act clearly contemplates that this review will be done primarily through Congressional oversight. Therefore, all of these statutory considerations weigh in favor of the majority view expressed by the federal courts, which calls upon the courts to limit judicial review in this field to making an independent assessment that the Bureau of Prisons engaged in an individualized determination of each inmate's placement, using the statutory factors set forth in the law. Smith v. Sanders, No. 09-3083, 2009 U.S. Dist. LEXIS 82265 (C.D. Cal. July 31, 2009).

Adopting this standard of review we believe that the record of these proceedings shows that Delacruz's request received individualized consideration at the prison. For example, on July 17, 2009, an RRC consideration form for Delacruz was completed

and approved by his prison unit manager. (Doc. 6, Ex. 1, Attach. 3.) At that time Delacruz was recommended for 180 days RRC placement. (Id.) On July 23, 2009, a Program Review was held with Delacruz. (Id. Ex. 1,¶ 11, Attach. 4.) This review was documented in an inmate skills development plan, (Id., Attach. 4 to Ex. 1), which thoroughly and individually considered Delacruz's criminal history, institutional conduct, social development, training programs, social history and family background. (Id.) During this review, Delacruz was informed that a range of 150-180 days would be recommended for his RRC placement. (Id.) This recommendation was discussed with Delacruz and it was determined that this range was of sufficient duration to provide the greatest likelihood of successful reintegration into the community.(Id.) On December 28, 2009, the Acting Unit Manager, the Case Manager Coordinator ("CMC"), the Inmate Systems Manager ("ISM") and the Warden approved Delacruz's recommended RRC placement for 120-180 days.( Id., Ex. 1 ¶ 12, Attach. 5.). This recommendation also reflected an individualized assessment of Delacruz's background and was based on Delacruz's past offenses and current behavior, as well as the available RRC resources within the release district.

But even if the Court embraced the more heightened standard of review adopted in Krueger v. Martinez, 665 F.Supp.2d 477 (M.D. Pa. 2009), this particular placement decision would still appear to meet the requirements set by law. At the outset, it is

evident that this decision involved a specifically tailored, and individualized assessment of the needs of inmate Delacruz, an assessment that was thoroughly documented by prison officials at the institution. Furthermore, we note that the prison's judgment in this case also appears to have considered the importance of RRC placements as a means of creating incentives for inmates to participate in educational programs, an issue that the court in Krueger specifically instructed prison officials to consider. In this case, Respondents acknowledge that they took this factor into account in making their RRC placement decision, (Doc. 6, p. 7-8), thus satisfying this specific requirement imposed by the court in Krueger. Therefore, regardless of the standard of review employed here, an assessment of the RRC placement decision in this case leads in the firm conviction that this decision represented an individualized assessment of the needs of this prisoner, which is all that the law requires, and all that an inmate can demand.

While we reach this result in this particular case, we note that Delacruz's petition clearly reflects that this inmate did not perceive this process to be one which involved an individualized assessment of his needs by prison staff. Such an individualized assessment is required, both by law and by prison policies which unequivocally state that prison officials: "must approach every individual inmate's assessment with the understanding that he/she is now eligible for a maximum of 12

months pre-release RRC placement," (Doc. 6, ex. 1, attach. 1, emphasis in original). We urge prison officials to remain mindful of the standards which they have set for themselves, and which Congress has set for them, as they ensure that all inmate understand that they are receiving an individualized assessment of their needs.

## IV.  <u>Recommendation</u>

Accordingly, for the foregoing reasons, upon consideration of this Petition for Writ of Habeas Corpus filed pursuant to 28, United States Code, § 2241,  IT IS RECOMMENDED that the Petition be DENIED, and that a certificate of appealability should not issue. The Petitioner is further placed on notice that pursuant to Local Rule 72.3:

> Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified  proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive

further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

*__S/Martin C.  Carlson__*
Martin C. Carlson
United States Magistrate Judge

Dated: March 3, 2010.